IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| D ANTHONY TYERILL WILLIS and KENDRA ANN LAVINDER, <br><br> Plaintiffs/Counter-Defendants, <br><br> vs. <br><br> RJC INVESTMENT, INC., <br><br> Defendant/Counter-Claimant. | CV 17-125-BLG-TJC <br><br> **ORDER** |

D Anthony Tyerill Willis and Kendra Ann Lavinder ("Plaintiffs") brought this action under the Truth in Lending Act seeking statutory damages and an award of finance charges and fees they paid under a contract and security agreement with Defendant RJC Investment, Inc. ("RJC"). (Doc.1, Count I.) Plaintiffs have also asserted a state law claim against RJC for failure to be licensed under the Montana Mortgage Act (Doc. 1, Count II), but now request the Court dismiss the claim as moot. (Doc. 21 at 1.) RJC has also asserted a counterclaim against Plaintiffs, including a breach of contract claim. (Doc. 5, Count I.)

Pending are the parties' cross motions for summary judgment.[1] (Docs. 21, 25.) The motions are fully briefed and ripe for decision. Having considered the

---

[1] Defendant's Motion for Oral Argument (Doc. 34) is also pending before the court and is **DENIED** as **MOOT**.

1

parties' arguments and for the following reasons, the Court orders that Plaintiffs' motion as to Count I of their complaint be **DENIED,** and that RJC's motion is **GRANTED** in part, and **DENIED** in part.

I. **BACKGROUND**

On April 22, 2014, Plaintiffs entered into an installment sale contract and security agreement with Cherry Creek Development, Inc. for the purchase of a mobile home. (Doc. 31 at ¶1; Doc. 18-1.) Plaintiffs also executed a promissory note to pay Cherry Creek $49,500 in accordance with the terms of the contract. (Doc. 18-5.) Cherry Creek assigned its interest in the contract and promissory note to RJC on April 1, 2014.[2] (Doc. 18-3.) Plaintiffs' monthly payment obligation under the contract, including principal, interest, and taxes, totaled $554.00 per month. (Doc. 31 at 3.) The contract provided for a $50 late fee on any payment five days past due. (Doc. 18-1 at 1.) The parties executed a modification to the contract on April 12, 2017. (Doc. 18-2.) The modification extended the grace-period for late payments, and credited Plaintiffs $1,100 for late fees paid.

Plaintiffs also entered agreements with Cherry Creek to rent the lot their mobile home was situated on, and to purchase a deck for their home. (Doc. 31 at ¶¶ 9-10; Doc 29-2 at 2, 4-10.) These agreements were entered on April 22, 2014

---

[2] Neither party offers any explanation as to why the assignment of the contract predates the execution of the contract and promissory note.

and May 1, 2014, respectively. *Id.* Plaintiffs purchased the deck for $1,160, to be paid in 24 installments of $48.50 each. *Id.* at ¶ 10.

After executing the contract, Plaintiffs were late on their payment obligations for the mobile home multiple times. (Doc. 27-3 at 8, Doc. 1 at ¶¶ 10,11; Doc. 18-4.) As a result, they were charged numerous late fees in the amount of $50 each. (Doc. 18-4.) In August of 2017, Plaintiffs voluntarily moved out of the mobile home and surrendered possession of the home to RJC. (Doc. 30 at 5; Doc. 27 at ¶ 11.)

On September 8, 2017, RJC notified Plaintiffs that they were in default under the terms of the contract by failing to make payments for the months of May, June, July, and August of 2017. (Doc. 27 at ¶ 9; Doc. 27-2.) RJC also informed Plaintiffs that if they failed to pay the total delinquency owed within thirty days, RJC could declare the total balance of the contract immediately due or terminate the contract. *Id.* Plaintiffs failed to cure the default; their last payment was remitted to RJC on August 21, 2017. (Doc. 18-4; Doc. 27 at ¶ 10).

On September 21, 2017, Plaintiffs filed this lawsuit against RJC asserting violations of the Truth in Lending Act ("TIL Act"). (Doc. 1, Count I.) Plaintiffs claim RJC violated the TIL Act (1) by assessing premature and excessive late fees under the contract; and (2) by failing to make required disclosures of credit terms when the contract was modified in April 2017. *Id.* at 3-4. Plaintiffs assert that

3

these violations entitle them to recover all finance charges and fees paid on the contract, as well as statutory damages of $4,000. *Id.*

RJC filed its answer and counterclaim against Plaintiffs on November 8, 2017. (Doc. 5.) RJC denies Plaintiffs' allegations in its answer, and asserts three counts against Plaintiffs in its counterclaim: breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), and attorney's fees (Count III). *Id.*

On July 20, 2018, the parties filed cross motions for summary judgment. (Docs. 21, 25.) Plaintiffs seek summary judgment on their truth-in-lending claims in Count I of the complaint; RJC also seeks summary judgment on Plaintiffs' TIL Act claims, and summary judgment on its breach of contract claim in Count I of its counterclaim.

## II. LEGAL STANDARD

### A. Summary Judgment

A court will grant summary judgment if the movant can show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden to submit evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those which may affect the outcome of the case. *Anderson*, 477 U.S. 242, 248 (1986). A

dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party. *Id.*

If the movant meets its initial responsibility, the burden shifts to the nonmoving party to establish a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). When parties file cross-motions for summary judgment, the Court reviews each motion on its own merits. *Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

**B. Truth In Lending Act**

Congress enacted the TIL Act to promote and achieve "the informed use of credit," which "results from an awareness of the costs thereof by consumers." 15 U.S.C. § 1601. It encourages fair and transparent credit extension practices by requiring credit term disclosures and prohibiting lending abuses. *Eby v. Reb Realty, Inc.*, 495 F.2d 646, 647 (9th Cir. 1974); 15 U.S.C. § 1601(a). Courts should liberally construe the Act in favor of consumers to implement its purpose. *In re Ramsey v. Vista Mortgage Group*, 176 B.R. 183, 187 (9th Cir. 1994) (citing *Eby*, 495 F.2d at 650).

Although it was enacted in 1968, the TIL Act has been amended multiple times. *In re Ramsey*, 176 B.R. at 186. Many of the modifications to the application of the Act are reflected in "Regulation Z." 12 C.F.R. Pt. 226.

Regulation Z was created by the Board of Governors of the Federal Reserve System, the entity charged with prescribing regulations to implement the TIL Act's statutory rules. *In re Ramsey*, 176 B.R. at 186; 15 U.S.C. § 1604. The Board has also published Official Staff Commentary to supplement Regulation Z and aid in its interpretation. *Id.* The Supreme Court has instructed courts to analyze truth in lending issues under the TIL Act with deference to Regulation Z and the Official Commentary. *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980).

**III. DISCUSSION**

### A. Was RJC required to make truth-in-lending disclosures in connection with the contract modification?

The TIL Act's foundation is grounded on the disclosure of credit costs and terms. 15 U.S.C. § 1601.[3] The disclosure requirements under the Act vary based on the characteristics of each credit transaction. Closed-end credit transactions, like the transaction at issue here, must adhere to the specific disclosure requirements set forth in the TIL Act and Regulation Z. 15 U.S.C. §1638; 12 C.F.R. § 226.18. A creditor who fails to adhere to these requirements may be liable to the debtor for statutory damages. 15 U.S.C. § 1640.

---

[3] "It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uniformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices."

Plaintiffs claim RJC failed to adhere to the disclosure requirements when the parties modified the contract. (Doc. 1 at ¶ 20). Plaintiffs maintain RJC's failure to make the disclosures entitles them to recover statutory damages. (Doc. 1 at ¶ 21.) In response, RJC argues the statute of limitations has run on Plaintiff's disclosure claim, and the claim is now barred.

Plaintiffs' disclosure claims must be brought "within one year from the date of occurrence of the violation." 15 U.S.C § 1640(e). The Ninth Circuit has held that the limitations period in § 1640(e) begins to run "at the consummation of the transaction." *King v. State of Cal.*, 784 F.2d 910, 915 (9th Cir.1986). S*ee also Merritt v. Countrywide Financial Corp.*, 583 Fed.Appx. 663, 664 (9th Cir. 2014) ("The TILA statute of limitations runs from when 'the borrower discovers or had reasonable opportunity to discover the fraud or nondisclosures that form the basis of the TILA action'" (citing *King*, 784 F.2d at 915), and *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1045 (9th Cir. 2011) (the limitations period began to run at execution "because [plaintiffs] could have discovered the alleged disclosure violations and discrepancies at that time").

Regulation Z defines consummation as "the time that a consumer becomes contractually obligated on a credit transaction." 12 C.F.R. § 226.2(a)(13). If a consumer credit transaction is secured by the consumer's dwelling, the required disclosures "shall be made to the consumer at the time of application for such

7

extension of credit." 15 U.S.C. §1638(b)(3). The Official Commentary also explains that "consummation for purposes of the regulation does not occur unless the consumer also contracts for financing at that time." 12 C.F.R. Pt. 226, Supp. I. 2(a)(13).

Plaintiffs entered into the contract and security agreement with RJC on April 22, 2014. (Doc. 31 at ¶ 1). They filed their lawsuit over three years later on September 21, 2017. (Doc. 1.) Plaintiffs argue that the statute of limitations has not run, however, because the limitations period began on April 12, 2017 when the contract was modified. (Doc. 31 at 11.) RJC counters that the limitations period began to run when the contract was signed on April 22, 2014 because RJC extended credit to Plaintiffs on that date. RJC also argues that it was not required to make any truth-in-lending disclosures in connection with the modification because it did not involve an application or extension of credit. (Doc. 29 at 13.)

The Court finds the statute of limitations began running when the parties executed the contract on April 22, 2014; the April 2017 modification was not an event triggering subsequent disclosure requirements. The following facts are undisputed: Plaintiffs and Cherry Creek entered into a contract for the sale of a mobile home on April 22, 2014 (Doc. 31 at 2); Cherry Creek extended credit to Plaintiffs on that date and retained a security interest in the mobile home until Plaintiffs' financial obligations under the contract were fully satisfied (Doc. 18-1 at

1); the contract was assigned from Cherry Creek to RJC (Doc. 18-3 at 1); the parties modified the contract on April 12, 2017, and provided for application of late fees to the balance due under the contract and extended the time for imposition of late fee payments from 5 to 10 days (Doc 18-2.); Plaintiffs not apply for any additional credit when the contract was modified (Doc. 27-3 at 8); Plaintiffs paid, and RJC accepted, monthly payments due under the contract until August of 2017 when Plaintiffs moved from the residence (Docs. 18-4, 27 at ¶11). Under these facts the contract was consummated on April 22, 2014 when Plaintiffs became contractually obligated on the credit transaction. *See* 12 C.F.R. § 226.2(a)(13). Because the statute of limitations begins to run "at the consummation of the transaction," the one-year limitations period began on April 22, 2014. *King*, 784 F.2d at 915.

Additionally, Plaintiffs offer no legal support, and the Court fails to find any, for their argument that the modification is subject to the TIL Act's disclosure requirements. First, the TIL Act only requires the creditor to make additional disclosures after consummation in certain circumstances. For example, new disclosures may be required for private education loans, certain mortgage and variable-rate transactions, refinancings, and assumptions. But none of those occurrences are applicable to the contract modification at issue. 12 C.F.R. §226.17(e), § 226.20.

Second, courts have not required a creditor to provide new truth-in-lending disclosures when a modification is executed, especially when the modification does not extend new credit. *See In re Hart*, 246 B.R. 709, 738 (D. Mass. Mar. 27, 2000) (refusing to recognize loan modification as a refinancing subject to the TIL Act); *In re Sheppard*, 299 B.R. 753, 762 (E.D. Pa. Oct. 6, 2003) (finding that a modification agreement was not a refinancing requiring new disclosures under the TIL Act because the modification supplemented the original contract, but did not replace it); *Carter v. Bank of America*, 2015 WL 12732427, *4 (C.D. Cal. Oct. 22, 2015) (finding debtor's claim that truth-in-lending disclosures should be made during a loan modification fails as a matter of law because loan modifications do not trigger new TIL Act obligations); *Diamond v. One W. Bank,* 2010 WL 1742536, *5 (D. Ariz. Apr. 29, 2010) ("[A] loan modification does not require additional TILA disclosures, particularly where no new monies are advanced.").

Based on the foregoing authority, Plaintiffs' action based on RJC's alleged failure to provide required TIL Act disclosures expired on April 22, 2015, and the claim is therefore barred by the statute of limitations.[4]

///

---

[4] Plaintiffs may still be able to assert their nondisclosure claim defensively by recoupment or set off in an action by RJC to collect the debt. *See* 15 U.S.C. § 1640(e).

**B. Did RJC charge premature and excessive late fees?**

Plaintiffs' second claim alleges that RJC charged them excessive and premature late fees in violation of the TIL Act. (Doc. 1 at 3-4.) In response, RJC argues that the late fee provisions relied upon by Plaintiffs only apply to high-cost mortgages. (Doc. 26 at 5); *See also* 15 U.S.C. § 1639(k). RJC argues that the contract does not qualify as a high-cost mortgage under the TIL Act because the loan was for less than $50,000. (Doc. 26. at 6.)

Under the TIL Act, a creditor may not charge a late fee in connection with a high-cost mortgage in excess of 4 percent of the amount past due unless specifically authorized in the loan documents. 15 U.S.C. § 1639(k)(1)(A)-(B). Further, a late fee cannot be imposed "before the end of the 15-day period beginning on the date the payment is due." 15 U.S.C. § 1639(k)(1)(C); *See also* 12 C.F.R. § 1026.34(a)(8). The TIL Act defines "high-cost mortgage" by statute and regulation. Plaintiffs solely rely on the statutory definition, which states:

> (A) The term "high-cost mortgage" . . . means a consumer credit transaction that is secured by the consumer's principal dwelling . . . if
>
> > (i) In the case of a credit transaction secured-
> >
> > > (I) By a first mortgage on the consumer's principal dwelling, the annual percentage rate at consummation of the transaction will exceed by more than 6.5 percentage points (8.5 percentage points, if the dwelling is personal property and the transaction is for less than $50,000) the average prime offer rate . . . for a comparable transaction[.]

15 U.S.C. § 1602(bb)(1)(A). Regulation Z defines high-cost mortgage as:

> any consumer credit transaction that is secured by the consumer's principal dwelling, other than as provided in paragraph (a)(2) of this section, and in which:
>
> (i) The annual percentage rate applicable to the transaction, as determined in accordance with paragraph (a)(3) of this section, will exceed the average prime offer rate, as defined in § 1026.35(a)(2), for a comparable transaction by more than:
>
> (A) 6.5 percentage points for a first-lien transaction, other than as described in paragraph (a)(1)(i)(B) of this section;
>
> (B) 8.5 percentage points for a first-lien transaction if the dwelling is personal property and the loan amount is less than $50,000;

12 C.F.R. § 1026.32. Under both definitions, the classification of a high-cost mortgage depends on (1) how much the annual percentage rate exceeds the average prime offer rate, and (2) whether the transaction or loan amount was less than $50,000.

The parties do not dispute that the transaction was a first mortgage on Plaintiffs' personal property, or that the annual percentage rate was more than 6.5% above the average prime rate offer. (Doc. 30 at 2; Doc. 26 at 6.) The average prime offer rate was 3.42% when the contract was executed. (Doc. 27 at 14.) The interest rate on the contract was 10.5%. (Doc. 1-1 at 2.) Therefore, Plaintiffs'

annual percentage rate exceeded the average prime offer rate by 7.08%. (Doc. 30 at 2; Doc. 26 at 6.)

The parties disagree, however, as to the transaction amount. If the transaction was for less than $50,000, the contract is not a high-cost mortgage because the average percentage rate does not exceed the average prime offer by 8.5%. Plaintiffs argue that the total transaction amount was $90,274, well within the threshold to qualify as a high-cost mortgage. (Doc. 30 at 2.) They reach that amount by combining the cash price of the mobile home, the total interest to be paid under the contract, and the down payment made at the time of contracting. (Doc. 30 at 2.) Alternatively, Plaintiffs argue that even if the applicable transaction amount is the mobile home's cash price alone, that amount still exceeds $50,000. (Doc. 30 at 3.) They explain that in addition to buying the mobile home, Plaintiffs also bought a deck for the home for $1,160. *Id.* Thus, they argue the cash price was $50,660.

Plaintiffs' argument is not supported by the plan language of Regulation Z. To qualify as a high-cost mortgage, the regulation provides that the annual percentage rate must exceed the average prime offer rate by more than 8.5% "if the dwelling is personal property and the *loan amount* is less than $50,000." 12 C.F.R. § 1026.32(a)(1)(i)(B) (emphasis added). The Official Commentary further explains, "[t]he creditor must determine whether to apply the APR threshold in §

1026.32(a)(1)(i)(B) based on the loan amount, which is the face amount of the note." 12 C.F.R. Pt. 1026, Supp. I, Part 3, 32(a). Regulation Z also defines "loan amount" as "the principal amount the consumer will borrow as reflected in the promissory note or loan contract." 12 C.F.R. § 1026.43(b)(5). Plaintiffs borrowed $49,500 under the Contract. (Docs. 1-1 and 18-5.) The loan amount is less than $50,000, disqualifying the transaction as a high-cost mortgage.

Plaintiffs' alternative method of reaching the $50,000 threshold also fails for the following reasons. Plaintiffs argue that RJC unlawfully split the deck and mobile home purchases into different parts to evade the TIL Act's requirements. (Doc. 30 at 3.) Plaintiffs are correct that "[a] creditor may not take any action in connection with a high-cost mortgage . . . to divide any loan transaction into separate parts for the purpose and with the intent of evading" the Act's disclosure requirements. 15 U.S.C. § 1639(r)(2). A lender may therefore violate the Act if "a borrower expected to receive a single loan executed in one transaction and nonetheless received two separate loans." *Kane v. Equity One, Inc.*, 2003 WL 22939377, *2 (E.D. Pa. Nov. 21, 2003) (citing *Hemauer v. ITT Fin. Servs.*, 751 F.Supp. 1241, 1243-44 (W.D. Ky. 1990)). Circumventing the TIL Act through loan splitting occurs "where the debtor wants, requests and expects to get a single loan consummated in a single transaction, but the lender instead documents and makes disclosures for the loan as if it were two separate transactions." *Kane,* 2003

WL 22939377, *2 (citing *Harris v. Ill. Vehicle Premium Fin. Co.*, 2000 WL 1307513, *2 (N.D. Ill. Sept. 12, 2000)).

Here, Plaintiffs argue the deck purchase price should be combined with the cash price of the mobile home, but don't claim to have expected a single loan for both transactions. In fact, the transactions occurred on different dates. The contract and security agreement for the purchase of the mobile home was executed in April 22, 2014; the deck purchase agreement indicates that Plaintiffs bought the deck on May 1, 2014. (Doc. 31 at 4.) Plaintiffs' payment history also shows their first payment towards the deck occurred on May 1, 2014. (Doc. 22 at 3.)

In addition, there is no indication Plaintiffs were charged any interest or other finance charges for the deck purchase. (Doc. 29-2.) The "Payment Agreement" for the deck is between Plaintiffs and Cherry Creek Development, Inc., and provides for the purchase of a deck for $1,163.00 to be paid in 24 monthly installments of $48.50. (Doc. 29-2.) While the Plaintiffs were to be charged a fee of $15.00 for late payments, it does not appear that any other interest or finance charges were included in the transaction.

In short, the contracts were entered into on different dates; the contracts involved the purchase of different personal property; and there is no similarity between the credit terms and conditions of the contracts. The Court cannot

15

conclude that a single transaction was split to avoid the application of the TIL Act's disclosure requirements.

Under these undisputed facts, the Court cannot find that the contract is a high-cost mortgage, or that RJC charged Plaintiffs excessive and premature late fees in violation of the TIL Act.

### C. Is Summary Judgment Appropriate on Defendant's Counterclaim for Breach of Contract?

RJC asserts a counterclaim against Plaintiffs under state law, and allege in Count I that Plaintiffs breached the contract. (Doc. 26 at 9.) RJC's claim is based on Plaintiffs' failure to make timely payments under the contract, and their subsequent failure to cure their default or remit further payment after August 21, 2017. *Id.* at 10. Plaintiffs argue the issue of contract enforcement is moot because Plaintiffs voluntarily moved out of the mobile home and RJC repossessed title. (Doc. 30 at 5.) Plaintiffs alternatively argue that this Court lacks jurisdiction over the breach of contract issue. *Id.*

The doctrine of supplemental jurisdiction gives this Court discretion to retain jurisdiction over related state claims when the claims over which it has original jurisdiction have been dismissed. 28 U.S.C. § 1367(a); *Brady v. Brown*, 51 F.3d 810, 816 (9th Cir. 1995.) The Court should consider the factors of judicial economy, convenience, fairness, and comity in determining whether to decline or

retain jurisdiction. *Trustees of Const. Industry & Laborers Health & Welfare Trust v. Desert Velley Landscape & Maint., Inc.*, 333 F.3d 923, 925 (9th Cir. 2003.)

"Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties by procuring for them a sure-footed reading of applicable law." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1996). Therefore, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 353 (1988.)

Here, the factors weigh in favor of declining to exercise jurisdiction. This is not an unusual case which calls for the Court to retain jurisdiction. The claim for breach of contract, and Plaintiff's other claims for bad faith and attorney's fees, arise under Montana law and involve matters of purely state and local concern. This Court has thus far only addressed issues arising under federal law. Additionally, the Court has not invested significant judicial resources on the state law claims. No trial date has been set in the case, and the Court has not addressed the merits of the breach of contract claim or the other claims in RJC's Counterclaim. In the interests of comity, the breach of contract issue would be more properly addressed in the state court.

Therefore, RJC's motion for summary judgment on its breach of contract claim will be denied, and RJC's counterclaim will be dismissed without prejudice.

## IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1. Plaintiffs' Motion for Summary Judgment (Doc. 21) as to Count I of their complaint is **DENIED**, and Plaintiffs' request to dismiss Count II of their complaint as moot is **GRANTED**;

2. RJC's Motion for Summary Judgment as to Count I of Plaintiff's Complaint (Doc. 25) is **GRANTED**, and RJC's Motion for Summary Judgment as to Count I of its counterclaim is **DENIED**.

3. Plaintiffs' Complaint (Doc. 1) is **DISMISSED** with prejudice

4. RJC's Counterclaim (Doc. 5) is **DISMISSED** without prejudice.

The Clerk is directed to enter judgment accordingly.

    **IT IS ORDERED.**

DATED this 18th day of March, 2019.

                                            TIMOTHY J. CAVAN
                                            United States Magistrate Judge